IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

GORDON GOINES,

          Plaintiff,

v.                                            Case No. 14-CV-00065

VALLEY COMMUNITY SERVICES BOARD,

DAVID SHAW,

ROBERT DEAN,

D.L. WILLIAMS,

JENNA RHODES,

and

JOHN DOES 1-10,

          Defendants.

## PLAINTIFF'S OPPOSITION TO THE MOTIONS TO DISMISS FILED BY DEFENDANTS DEAN, SHAW, AND WILLIAMS

Table of Contents

I.   PRELIMINARY STATEMENT                                                          1

II.  FACTS                                                                          2

     Goines' Medical Condition                                                      2

     The Seizure of Goines                                                          2

     The Detention of Goines                                                        6

III. LEGAL STANDARD                                                               10

IV.  ARGUMENT                                                                      10

     A.  Defendants misconstrue F.R.C.P. 10(c).                                    10

     B.  Defendants are not entitled to qualified immunity.                        13

         1.  The initial arrest of Goines by Dean and Shaw was
             unsupported by probable cause.                                        13

         2.  Williams lacked probable cause to believe that Goines met
             the criteria for involuntary admission to a mental health facility    19

         3.  The right to be free from arrest unless probable cause exists
             is clearly established in the mental health seizure context.          22

     C.  Whether qualified immunity applies is not appropriate for
         resolution on a  Rule 12(b)(6) motion.                                    24

V.   CONCLUSION                                                                    25

# I.  PRELIMINARY STATEMENT

This case arises out of the unlawful seizure and detention of Gordon Goines, a law-abiding resident of Waynesboro, Virginia. Goines suffers from a degenerative neurological condition, similar to Lou Gehrig's Disease. The condition impairs his balance, causing him to walk with an unsteady, lurching gait. It also impairs his speech, causing him to stammer and slur his words. It is not a mental illness and does not affect his cognitive functioning.

On May 15, 2014, Goines went to the Waynesboro Police Department to report a theft. Instead of investigating the theft, Defendants Officers Dean and Shaw assumed that Goines had "mental health issues" because of his unsteady walk and speech impediment — physical disabilities that have nothing to do with Goines' mental health. Dean and Shaw seized Goines, forcibly and against his will, transported him to a mental health facility, and — with the assistance of Defendant Williams and other Defendants — caused him to be detained for six days, purportedly under Virginia laws involving mental health evaluations, all without probable cause and in violation of the rights guaranteed to him by the law of Virginia and by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

Goines brings the action pursuant to 42 U.S.C. § 1983 for violation of his constitutional rights, along with pendent state law claims for false imprisonment. Defendants Dean, Shaw, and Williams have moved to dismiss based on the doctrine of qualified immunity. (DN 12, 14, 16.) As explained in more detail below, Dean,

Shaw, and Williams are not entitled to qualified immunity because their actions clearly violated Goines' Fourth Amendment right to be arrested only upon probable cause. The motions should be denied.

## II. FACTS

### Goines' Medical Condition

Goines is an African-American male age 37. Goines suffers from cerebellar ataxia, a degenerative neurological condition similar to Lou Gehrig's Disease.

As a result of this disorder, Goines has difficulty with his balance, speech, and certain fine motor functions, including the movement of his hands, legs, and eyes. The disorder makes it difficult for him to maintain a normal upright posture when walking, causing him to walk with an unsteady, lurching gait. The disorder also impairs the muscles that produce speech. Consequently, Goines speaks slowly and has difficulty pronouncing words. He must concentrate to form each word, pausing, and his speech is slurred. (Complaint ¶¶ 14-15.)

The impacts of cerebellar ataxia are purely physiological. The disorder does not affect Goines' judgment or cognitive functioning. He is a man of normal intelligence, mentally stable, and acutely aware of the world around him. He has no "mental health issues." (Id. ¶ 16.)

### The Seizure of Goines

In the days leading up to May 15, 2014, Goines noticed a problem with the cable service at his home in Waynesboro, Virginia. Specifically, his service would intermittently disconnect throughout the day. During these periods of

OPPOSITION TO OFFICER DEFENDANTS'
MOTIONS TO DISMISS
5:14-CV-65

disconnection, the television would freeze and produce extremely loud line noise and signals, including a clicking noise. Goines notified Comcast, his cable service provider. (Id. ¶¶ 17-18.)

On or about Thursday, May 15, 2014, Comcast dispatched a field tech to Goines' residence. The field tech determined that someone in Goines' apartment complex had spliced the cable running to Goines' apartment. In other words, a neighbor was stealing Goines' cable. This was the cause of the constant disconnections, loud line noise, and signals that Goines' television produced whenever he turned it on. (Id. ¶ 19.)

The field tech told Goines there was nothing he could do to stop the theft — or even identify which neighbor was the thief — without entering other apartments in the complex, which the field tech was not legally authorized to do. The field tech recommended that Goines notify the police. (Id. ¶¶ 20-21.)

The City of Waynesboro Police Department is located across the street from Goines' apartment. That afternoon, May 15, 2014, Goines walked across the street and reported the cable theft to an Officer Feazell in the lobby of the Waynesboro Police Department. (Id. ¶¶ 22-23.) Goines told Feazell he was reporting the theft to the police because he would not feel comfortable confronting his neighbor about it, not knowing how the neighbor would react to an accusation of theft. Goines told Feazell he did not want to "get in a fight" with the neighbor. (Id. ¶ 23.)

Feazell contacted Defendants Shaw and Dean. According to an incident report later prepared by Shaw, Feazell advised Shaw and Dean that Goines "seemed

to have some mental health issues going on over an issue with a television." (Id. ¶ 24.) Shaw and Dean approached Goines in the lobby of the police department. Shaw asked Goines if he and Dean "could go over to [Goines'] apartment and he could show us what was going on." Goines agreed. The two officers then followed Goines to his apartment. (Id. ¶¶ 25-26.)

Shaw and Dean apparently ignored or did not take the time to understand Goines' complaint about a neighbor stealing his cable. According to the report later prepared by Shaw, Goines told them —accurately— "there was a clicking noise in the wall because someone outside was controlling his T.V." The officers responded by asking Goines if he "had any mental health issues" or "had a doctor for issues." Goines told them he did not. Nevertheless, Shaw and Dean concluded that Goines was "having irrational issues and hearing things." When they arrived at Goines' apartment, Shaw and Dean did not hear the line noise and signals because they did not take the time to turn on Goines' television. (Id. ¶¶ 27-29.)

Instead, Shaw and Dean proceeded to interrogate Goines about his statement that he did *not* want to "get in a fight" with the neighbor. Goines made this statement to explain why he was reporting the theft to the police, instead of confronting the neighbor himself. (Id. ¶ 23.) Shaw and Dean asked Goines to further explain his statement, prompting Goines to respond that he did not want to get in a fight because he did not want anybody to get hurt. The officers proceeded to ask Goines *what he would use* to hurt the neighbor who stole his cable, if they got in a fight. Goines said he would "use his hands." The officers asked Goines how he

would use his hands, prompting Goines to reply, "by punching." At that point, according to the incident report later prepared by Shaw, Shaw asked Goines if he wanted to "talk to someone about all of these problems." (Id. ¶ 30.)

Goines reasonably understood Shaw to be asking if he wanted to "talk to someone" about the cable theft. Goines stated that he did. (Id. ¶ 31.)

Following this "investigation", Shaw and Dean, acting without any warrant or judicial authorization, seized Goines while Goines was within the curtilage of his residence. They escorted Goines back to the police station, and forced him into the caged portion of a police vehicle in the parking lot. (Id. ¶ 32.)

Inside the car, Goines told the officers he wanted to go home. He asked them to let him out of the car. Dean told Goines "that wasn't an option." (Id. ¶ 33.) The time was approximately 5:13pm. At no time did Goines make any threat to do harm to any person or to himself. (Id. ¶ 34.) Dean and/or Shaw then transported Goines — forcibly and against his will — to Augusta County Medical Center, where Goines was stripped, searched, and handcuffed to a table for approximately three hours. (Id. ¶ 37.)

Dean and Shaw carried out the foregoing seizure, transportation, and initial detention without informing Goines of his legal rights, without informing him of any charge or complaint against him, and without providing him with any basis or authorization for his arrest and detention. (Id. ¶ 41.)

At the time Dean and Shaw carried out the arrest and detention of Goines, neither of them had probable cause to believe that Goines had committed any crime

or that Goines posed a danger to himself or others. They had no legitimate or lawful basis to seize, arrest or detain Gordon Goines. (Id ¶ 44.)

**The Detention of Goines**

At the hospital, Dean or Shaw then placed a phone call to one of the John Does and requested a background check on Goines. The background check revealed that Goines had no criminal record whatsoever. The background check also revealed that Goines owned a registered firearm. So Dean or Shaw interrogated Goines about the firearm. Goines explained he purchased it in or around 2010 when he worked as a security guard in Albemarle County. Goines further explained that he kept the firearm locked in a safe at his apartment. (Id. ¶ 38.)

When these facts did not appear to satisfy Dean or Shaw, Goines — who remained handcuffed to a table — told the officers that if they would take him home, they could have the firearm. (Id. ¶ 39.) Goines repeatedly stated to Dean and others at the hospital that he wanted to go home. They ignored him. (Id. ¶ 40.)

At approximately 6:00pm, Dean summoned Defendant Jenna Rhodes, an employee of Defendant Valley Community Services Board, to evaluate Goines while Goines was detained against his will at Augusta County Medical Center. At approximately 6:15pm, Defendants Officers Scott (John Doe 1) and Williams came to the hospital and relieved Dean. (Id. ¶ 46.)

At some time during Goines' detention at August County Medical Center — believed to be around 8:30 pm — Rhodes, Williams, and/or one of the John Does

petitioned a magistrate judge to order Goines' involuntary admission to a mental health facility pursuant to Virginia Code § 37.2-809 ("May 15 Petition"). [1] (Id. ¶ 47.)

The May 15 Petition alleged (i) that Goines had a mental illness and was in need of hospitalization or treatment, (ii) that there existed a substantial likelihood that, as a result of mental illness, Goines would, in the near future, cause serious physical harm to others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, and (iii) that Goines would suffer serious harm due to his lack of capacity to protect himself from harm or provide for his own basic human needs. (*See* Complaint, Exhibit A.)

The May 15 Petition was accompanied by a Preadmission Screening Report completed by Rhodes, which included the "diagnosis" that Goines had a "Psychotic Disorder NOS (298.9)." (*See* Id., Ex. A at 6.) Yet, in her assessment, Rhodes stated only that Goines "often displays inappropriate affect" and was "appearing to respond to internal stimuli by his eyes darting about the roof, as if responding to visual hallucination." Rhodes also indicated that Goines, whose watch and cell phone had been confiscated, appeared "disoriented as to time." Rhodes also noted that Goines had informed her — accurately — that he (Goines) has a "shrunken cerebellum" that was continuing to shrink. (Id. at 2.) Although Goines provided Rhodes with the name of his physician who could further explain his cerebellar ataxia, the physician was never contacted. (Id. ¶ 49.)

---

[1] Rhodes' report identified Dean as the petitioner, but the petitioner's name was omitted from the Order granting the petition. (Complaint, Ex. A at 1 and Ex. B.)

Rhodes has a master's degree in education. At all times relevant to this Complaint, Rhodes was not a licensed medical professional, clinical psychologist, or clinical social worker in Virginia or any other state. As such, Rhodes lacked the education or experience to be professionally qualified at the autonomous practice level to make direct diagnoses of psychological or mental health disorders. (Id. ¶50.)

In diagnosing Goines with "Psychotic Disorder NOS (298.9)", Rhodes engaged in clinical psychology without being qualified to perform the diagnostic function of a clinical psychologist. The appropriate diagnosis of mental disorders is a discretionary clinical function, requiring the exercise of professional judgment. As such, it may not be delegated to unlicensed personnel. (Id. ¶¶ 50-51.)

By delegating the diagnostic function to Rhodes, Valley Community Services Board failed to provide an adequate evaluation and diagnosis of Goines. In so doing, the Board acted with deliberate indifference to the clear and apparent risk to the Fourth Amendment Rights of Goines and other citizens facing an involuntary mental health detention and the attendant loss of liberty from such seizures. (Id. ¶ 52.)

Based on the observations of Goines as set forth in the Preadmission Screening Report, Rhodes lacked probable cause to make the allegations that Goines either (a) had a mental illness, or (b) would cause serious harm to himself or others as a result of a mental illness, or (c) was in need hospitalization or treatment as set forth in the May 15 Petition for a temporary detention order against Goines. (Id. ¶ 53.)

On information and belief, Rhodes petitioned for Goines' detention at the request of Officers Dean and Williams, who also lacked probable cause to make the allegations set forth in the May 15 Petition and report against Goines. Instead, the baseless allegation that Goines had a mental illness and posed a threat of harm to others or himself was a pretext for the Defendants' involuntary and unlawful commitment of Goines. (Id. ¶ 54.)

Based upon the "bare bones" and conclusory May 15 Petition and Rhodes' accompanying report, a magistrate issued a Temporary Detention Order at 8:41 pm on May 15, 2014. (*See* Complaint, Exhibit B.) Pursuant to the Temporary Detention Order, Goines was transported, against his will, to Crossroads Mental Health Center, thus isolating Goines from his family, friends, and attorneys. Goines' cell phone was confiscated and he was not permitted to contact his family, friends, or attorneys at any time during his detention. (Id. ¶¶ 55-57.)

The Temporary Detention Order served as the basis to deprive Goines of his liberty for six days. On May 20, 2014, a hearing was held at Crossroads Mental Health Center, apparently on a Petition for Involuntary Admission for Treatment of Goines, although no record of the hearing or petition was ever filed with the Waynesboro Circuit Court. As a result of the hearing, Goines was released from his incarceration and commitment sometime in the evening on May 20, 2014. (Id. ¶ 58.)

Goines has no history of mental illness and has never been treated or sought treatment for mental illness. At no time has any person offered evidence that Goines has harmed or threatened to do harm to any person. (Id. ¶¶ 59-60.)

Goines brings the action pursuant to 42 U.S.C.A. § 1983 for violation of his constitutional rights, along with pendent state law claims for false imprisonment. Defendants Dean and Shaw have moved to dismiss for failure to state a claim based on the doctrine of qualified immunity. Defendants are not entitled to qualified immunity because their actions clearly violated Goines' Fourth Amendment right to be arrested only upon probable cause.

The motions should be denied.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 287 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)); *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

When deciding a motion to dismiss, a court must accept "all factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Kensington Volunteer Fire Dep't v. Montgomery Cnty.,* 684 F.3d 462, 467 (4th Cir. 2012).

## IV.   ARGUMENT

### A.   Defendants misconstrue F.R.C.P. 10(c).

Goines attached a copy of Rhodes' "Preadmission Screening Report" to the Complaint (Ex. A), and asserts that Rhodes lacked probable cause for the bare bones conclusions in that report. Goines supports this assertion with detailed

paragraphs explaining, inter alia, that Rhodes' observations of Goines did not support her conclusions; Rhodes lacked the experience or education to diagnose mental health disorders; and Rhodes actually completed the report at the request of the Defendant police officers, who also lacked probable cause to make the conclusions set forth in the report. (Complaint ¶¶ 49-55.) Goines also attached a copy of the Temporary Detention Order to the Complaint (Ex. B). The TDO confirms that Rhodes' report was the basis for the issuance of the TDO.

Citing Federal Rule of Civil Procedure 10(c), Defendants argue that by attaching the report and TDO as exhibits, Goines necessarily adopted all statements in these documents as true, including the exculpatory conclusions, thereby contradicting and defeating his own claim. This is not a proper reading of the rule.

Courts interpreting Rule 10(c) have found that, "[i]f the appended document ... reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir. 1974). Thus, "an appended document will be read to evidence what it incontestably shows once one assumes that it is what the complaint says it is." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir. 1995). For example, a written contract appended to the complaint will defeat invocation of the Statute of Frauds. *Id.* Similarly, in the case cited by Defendants, the Court relied upon the time period stated in the contract attached to the complaint, rather than the incorrect period alleged in the complaint, to conclude that a contract claim was time-barred.

*Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465–68 (4th Cir. 1991).

By the same token, however, a libel plaintiff may attach the writing alleged in the complaint to be libelous without risk that the court will deem true all libels in it. *Gant*, 69 F.3d at 674 (holding that the district court erred when it adopted as true the contents of a superintendent's report that was attached to the complaint and found that it refuted the plaintiffs' allegations); see also *Great Northern Insurance Co. v. Recall Total Info. Mgmt.*, 2014 WL 5298014 at *2-4 (D. Md. Oct. 14 2014) (occupational safety report attached to complaint; holding that it would be inappropriate to take the statements in the report as true and find that it refutes the allegations in the complaint).

Under Rule 10(c), the report and TDO should be read as being what the Complaint says they are. This would effectively refute any (hypothetical) allegation that Rhodes prepared no report, or prepared one that admitted wrongdoing by the defendants. But the report and TDO do not establish, simply by being what they are, that the defendants had probable cause to seize Goines or to detain him for six days. (DN 12 & 14 at 3.) Given the allegations in the Complaint, Goines clearly intended Exhibits A and B to be read as self-serving documents rather than a particularization of his claim. Therefore, the Court should not assume that the Complaint adopted the Defendants' exculpatory conclusions.

### B. Defendants are not entitled to qualified immunity.

This case involves two unlawful arrests. The first occurred at approximately 5:13 p.m., when Dean and/or Shaw transported Goines against his will to Augusta County Medical Center, where Goines was stripped, searched, and handcuffed to a table. The second began at approximately 8:41 p.m., when Rhodes and Williams, at Dean's request, obtained an order to continue Goines' forcible detention for six days in a mental health facility.

Defendants contend that Dean, Shaw, and Williams are entitled to qualified immunity. The touchstone of the qualified immunity analysis is whether the police violated a right that was "'sufficiently clear' so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right." *Bailey*, 349 F.3d at 741 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (internal citations omitted)). In other words, did the police transgress a "bright-line," or were they simply acting within a "gray area." *Id.* (quoting *Takoma Park*, 134 F.3d at 266). The Complaint describes an obvious violation of Goines' constitutional right to be free from arrest without probable cause. Because an objectively reasonable officer would have known that initial seizure and subsequent detention of Goines violated that right, Defendants are not entitled to qualified immunity.

### 1. The initial arrest of Goines by Dean and Shaw was unsupported by probable cause.

The initial arrest was purportedly carried out pursuant to VA Code § 37.2-808(G) and (A), which authorize a law enforcement officer to take a person into "emergency custody" when the officer has probable cause to believe that the person

(i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others [and] (ii) is in need of hospitalization or treatment[.] VA Code § 37.2-808(A).

Defendants contend that Officers Dean and Shaw had probable cause to believe that Goines met these criteria. This contention is based entirely on the following allegations in Shaw's incident report, none of which are entitled to any assumption of truth:

(1)     that Goines was "displaying paranoia over people controlling his television, hearing this clicking noise in the wall, even though we didn't," and

(2)     Goines made "repeated statements that he was going to handle the situation by using his hands to hurt the neighbors."

(DN 12 & 14 at 3, Ex. C at 3.) These allegations do not establish probable cause as to any of the criteria for emergency custody. First, Goines has no mental illness.[2] He has a speech impediment. He did not "display[] paranoia over people controlling his television." A neighbor, having spliced the cable running to Goines' apartment, actually was controlling Goines' access to cable television. The neighbor's use of Goines' cable caused Goines' television to disconnect and produce loud line noise and signals, including a "clicking noise," when the TV was

---

[2] "Mental illness" means a disorder of thought, mood, emotion, perception, or orientation that significantly impairs judgment, behavior, capacity to recognize reality, or ability to address basic life necessities and requires care and treatment for the health, safety, or recovery of the individual or for the safety of others. VA Code § 37.2-100.

turned on. If Officers Dean and Shaw did not hear these noises, it was because they did not bother to turn on Goines' television.

Second, because Goines has no mental illness, there was never any possibility — much less a "substantial likelihood" — that Goines would, "as a result of mental illness . . . cause serious physical harm to himself or others."

Third, the officers had no reason — much less probable cause — to believe that there was a "substantial likelihood" that Goines would "cause serious physical harm to himself or others." Goines has never harmed anyone. He never attempted to harm anyone. And he never threatened to harm anyone.

Contrary to Defendants' assertions, <u>Goines never said</u> he was "going to handle the situation by using [my] hands to hurt the neighbors." No one speaks that way. This is why Shaw's incident report <u>never quotes Goines</u>. Rather, Officers Dean and Shaw constructed this "statement" out of Goines' responses to their inappropriate Reid-style questions. Goines told the officers that he was reporting his neighbor's cable theft to the police because he would not feel comfortable confronting the neighbor himself.  He did not know how the neighbor would react, and "did not want to get in a fight" with the neighbor. (Complaint ¶ 23.) This is a harmless statement. It was particularly harmless in this context, where Goines' did not even know which of his neighbors was the thief.

Instead of questioning the neighbors, however, the officers interrogated Goines about what he meant by not wanting to "get in a fight." Goines responded that he did not want anybody to get hurt. The officers then proceeded to ask Goines

*what he would use* to hurt the neighbor who stole his cable, if they got in a fight. Goines said he would "use his hands." When the officers then asked Goines how he would "use his hands", Goines said "by punching." Thus, even if these responses by Goines were construed to be an actual threat — which they were not — it was never a threat to cause serious physical harm.

Contrary to Defendants' assertions, Goines never threatened to harm anyone with a firearm. That Goines happens to own a firearm is irrelevant, because the officers did not know about the firearm at the time of the initial arrest.[3] Dean obtained this information at the hospital, after the arrest, apparently by running a background check on Goines. (Complaint ¶ 38.) When Dean proceeded to interrogate Goines about the firearm, Goines was understandably led to believe that the officers had a "problem" with his ownership of a firearm. In an effort to persuade the officers to release him, Goines even told the officers that if they would take him home, "they could have the firearm." (Id. ¶ 39.)

These facts — which must be taken as true for the present purposes — do not demonstrate the requisite mental illness nor the substantial likelihood of serious physical harm required to make out probable cause for arrest under VA Code § 37.2-808(G) and (A). Basing a warrantless arrest on a police officer's uninformed, rash assumptions about mental illness would allow virtually any "emergency custody" arrest to be justified post hoc.

---

[3] For the same reason, Rhodes' "evaluation" of Goines is irrelevant to Defendants' motions, because it took place after the arrest.

The Court of Appeals for the Fourth Circuit has found an absence of probable cause under far less innocuous circumstances. In *Bailey v. Kennedy*, the Court determined that a neighbor's 911 call reporting that the plaintiff threatened to kill himself was insufficient, "without more," to establish probable cause for police to seize him for a psychological evaluation. 349 F.3d 731, 740 (4th Cir. 2009). In light of *Bailey*, Goines' purported "threat" that he might punch a neighbor for stealing his cable is wholly insufficient to create probable cause for the officers' actions.

Defendants contend, without explanation, that probable cause existed for the initial arrest under *Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2011). (DN 12 & 14 at 9.) This case is nothing like *Cloaninger*. In that case, police received a 911 call from the plaintiff's doctor that the plaintiff — Cloaninger — was threatening to kill himself. The police knew that Cloaninger had made prior suicide threats, and that police responding to those threats found firearms in his home. 555 F.3d at 334. When the police arrived at Cloaninger's home, he refused to open the door and "ordered them off his property or else he would kill them all and then kill himself." *Id*. at 328. After several failed attempts to contact Cloaninger's doctor, the officers contacted a VA nurse who knew Cloaninger and who confirmed his prior suicide threats. The nurse agreed that an emergency commitment was appropriate. *Id*. at 328-29. "[A]fter collecting all this information and professional advice," this "additional information ... established probable cause." *Id*. at 333.

*Cloaninger* only supports Goines' position that Officers Dean and Shaw lacked probable cause to seize Goines. Goines never threatened to harm anyone. No

attempt was made to collect "information and professional advice," such as by contacting Goines' family, or his doctor, or anyone who knew Goines. Instead, they assumed he had "mental health issues" because of his unsteady walk and difficulty pronouncing words — physical disabilities that have nothing at all to do with Goines' mental health. Any reasonable officer would have known the difference, or at least taken the time to contact someone who did.

Moreover, in each of the Fourth Circuit cases addressing qualified immunity in the context of a mental health detention, the police were "hurriedly called to the scene of a disturbance" or perceived emergency situation. *See Cloaninger, supra; Gooden v. Howard County,* 954 F.2d 960, 965 (4th Cir. 1992) (responding to repeated reports and observations of "long, loud blood-chilling screams" coming from plaintiff's apartment); *S.P. v. Tacoma Park,* 134 F.3d 260, 264 (4th Cir. 1997) (responding to a reported suicide threat, officers found the plaintiff "visibly agitated and crying" about a "painful argument" that had caused her husband to leave. *Id.* She also told the officers "if it was not for her kids she would end her life.") Arguably, such an immediate emergency was present in *Bailey*, where police officers believed a suicide might be imminent, though that belief was later determined to be unreasonable. 349 F.3d at 740–41. In Goines' Complaint, there is no allegation of any emergency situation when he was arrested.

Dean and Shaw had no evidence to support their assumption that Goines had "mental health issues." They had no reason to believe that Goines was "in need of hospitalization or treatment." And they observed nothing to suggest that Goines

posed an immediate danger of serious physical harm to anyone. Taking these facts as true, Goines' interaction with the officers was insufficient to establish probable cause to detain him for an emergency mental evaluation.

### 2. Williams lacked probable cause to believe that Goines met the criteria for involuntary admission to a mental health facility

Defendants Dean, Williams, and Rhodes subsequently caused Goines to be detained in a mental health facility against his will for six days. This detention was purportedly carried out pursuant to VA Code § 37.2-809(B), which authorizes a magistrate to issue an involuntary detention order if it appears "from all evidence readily available, including any recommendation from a physician or clinical psychologist treating the person, that the person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others [and] (ii) is in need of hospitalization or treatment[.] *Id*.

Defendants contend that Officers Dean and Williams had probable cause to believe that Goines met these criteria. As explained above, Dean never had probable cause to believe that Goines satisfied any of them. After Dean transported Goines against his will to Augusta Medical Center. Defendant Williams came to the hospital and replaced Dean. Williams continued the forcible detention of Goines at Augusta Medical Center for approximately two and a half hours, despite Goines' repeated requests that he wanted to go home. (Id. ¶ 40.) At no time did Williams

have probable cause to believe that Goines had committed any crime, or that Goines posed a danger to himself or others. (Id. ¶ 44.)

Moreover, Williams played a role in procuring the temporary detention order that served as the basis to unlawfully deprive Goines of his liberty for six days. As alleged, "Defendant Rhodes petitioned for Goines' detention at the request and/or instigation of one or more John Does[.]" (Id. ¶ 54.) Based on the information currently available to Goines, these John Does appear to be Officers Dean and Williams. Williams, in particular, was with Rhodes at the hospital during and after her "evaluation" of Goines. Upon information and belief, Williams' communications with Rhodes influenced Rhodes to include the following "bare bones" and conclusory allegations in her report to the magistrate:

> (i) that Goines had a mental illness and was in need of hospitalization or treatment, (ii) that there existed a substantial likelihood that, as a result of mental illness, Goines would, in the near future, cause serious physical harm to others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, and (iii) that Goines would suffer serious harm due to his lack of capacity to protect himself from harm or provide for his own basic human needs.

(Complaint ¶ 48, Ex. A at 8.)

Like Dean (and Rhodes), Williams lacked probable cause to support these allegations, which formed the basis for the temporary detention order that deprived Goines of his liberty for six days. Williams observed nothing to suggest that Goines had "mental health issues," or that Goines was "in need of hospitalization or treatment." And Williams observed nothing to suggest that Goines posed a danger to anyone. *See, e.g. Bailey*, 349 F.3d 731, 741 (holding that officers lacked probable

cause for a mental health seizure, "where the officers were able to observe the person alleged to be suicidal and observed nothing indicating that the person might have been a danger to himself.") Instead, the baseless allegation that Goines had a mental illness and posed a threat of harm to others or himself was a pretext for the Defendants' involuntary and unlawful commitment of Goines. (Id. ¶ 54.)

Defendants contend that Williams is entitled to qualified immunity. (DN 16 at 2-3.) This contention is based entirely on the fact that Goines attached copies of Rhodes' report and the Temporary Detention Order as exhibits to the Complaint. (*See* Complaint, Exs. A and B.) Therefore, Defendants argue, Goines necessarily adopted every statement in the report and TDO as true, including the boilerplate exculpatory "conclusions" that probable cause existed for the detention. (DN 16 at 2-3.)

Again, this argument misconstrues Federal Rule of Civil Procedure 10(c). Rule 10(c) simply means that the report and TDO should be read as being what the Complaint says they are. Given the allegations in the Complaint, Goines clearly intended Exhibits A and B to be read as self-serving documents rather than a particularization of his claim. Taking these facts as true, Goines' interactions with Williams were insufficient to establish probable cause to detain Goines, or to support the conclusory allegations that Williams requested Rhodes include in her report.

### 3. The right to be free from arrest unless probable cause exists is clearly established in the mental health seizure context.

Defendants Dean, Shaw, and Williams are therefore not entitled to qualified immunity, because they arrested Goines in violation of a "clearly established … right [ ] of which a reasonable person would have known." *Bailey* 349 F.3d at 740 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is "clearly established" if " 'the contours of the right [are] sufficiently clear' " so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right. *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

In light of established Fourth Circuit authority defining probable cause in the mental health seizure context, a reasonable police officer would have known that he did not have probable cause to arrest Goines. The "general right to be free from seizure unless probable cause exists [is] clearly established in the mental health seizure context." *Gooden*, 954 F.2d at 968; *Bailey* 349 F.3d at 740. Defining the right at issue in this case with the requisite "high level of particularity," *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999), the question is whether, at the time of Dean and Shaw's actions, it was clearly established that a police officer may not detain someone for an emergency mental evaluation based only on an individual's physical disabilities and a statement that he did not want to get in a fight.

It was clearly established that probable cause was lacking in the situation. "The law in no way permits random or baseless detention of citizens for

psychological evaluations." *Gooden,* 954 F.2d at 968. Accepting the facts as alleged, the officers observed nothing that would indicate to them that Goines might be a danger to anyone. No reasonable officer, upon hearing Goines state that he was reporting a neighbor's crime because he "did not want to get in a fight" with the neighbor would have thought that Goines was in such imminent danger of harming someone that immediate seizure was required. Moreover, even assuming that Goines did say, in response to the officers' questioning, that he might punch the neighbor in the event of an unwanted fight, there is nothing in the Complaint — or the incident report — to suggest that this comment would have made a reasonable officer believe that immediate seizure was necessary.

With respect to Williams, the question is whether it was clearly established that a police officer may not detain an individual against his will, or instruct a mental health examiner to recommend an involuntary detention in a mental health facility, when the officer observed nothing to suggest that the individual had a mental illness or posed a danger to anyone. This was clearly established. There is nothing in the Complaint to suggest that Williams observed anything that would have made a reasonable officer believe that an involuntary detention was necessary.

The contours of probable cause were sufficiently clear that the unlawfulness of seizing and detaining Goines would have been apparent to reasonable officers. Accordingly, the officers' claims of qualified immunity should be denied.

Finally, Goines' state law false imprisonment claim turns largely on the same analysis addressed with respect to qualified immunity. Under Virginia law, "[f]alse

imprisonment is the restraint of one's liberty without any sufficient legal excuse. If the plaintiff's arrest was lawful, the plaintiff cannot prevail on a claim of false imprisonment." *Lewis v. Kei*, 281 Va. 715, 721 (2011) (citations omitted). Because, given the facts as alleged, there was no probable cause to seize or detain Goines, the police officers also committed false imprisonment under state law.

### C. Whether qualified immunity applies is not appropriate for resolution on a Rule 12(b)(6) motion.

The Complaint pleads an ample factual basis to conclude that the officer Defendants are not entitled to qualified immunity. Defendants argue that the Court should grant immunity to these defendants prior to discovery, on the grounds that the officers' actions were supported by probable cause. Courts, however, appropriately reject 12(b)(6) motions based on such arguments, resolving the question of whether qualified immunity applies after there is a factual record. *See, e.g., Raub v. Bowen*, 960 F. Supp. 2d 602, 613 (E.D. Va. 2013)(denying motion to dismiss on qualified immunity grounds in the mental health seizure context; holding that "where the Complaint alleges an arrest without any knowledge of a risk of harm," the plaintiff has sufficiently alleged that the Defendants violated a clearly established right.)

Indeed, the Fourth Circuit Court of Appeals has repeatedly held that "ordinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (citing *Wilson v. Kittoe,* 337 F.3d 392, 397 (4th Cir. 2003); *Pritchett v. Alford*, 973 F.2d 307, 312

(4th Cir. 1992)("the qualified immunity question can be difficult for a court to resolve as a matter of law, as it can at times require "factual determinations respecting disputed aspects of [a defendant's] conduct."

In particular, the question of whether the conduct allegedly violative of a right occurred is quintessentially one of fact. *See Willingham*, 412 F.3d at 559 ("a genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred ... must be reserved for trial.") (internal quotations omitted). Indeed, Defendants arguments invoke disputed facts. Defendants claim, in circular fashion, that their seizure and detention of Goines did not violate Goines' rights because "the detention and seizure of Goines were reasonable and supported by probable cause." (DN 12 & 14 at 6.) This is a disputed factual question appropriately addressed after discovery creates a factual record

## V.    CONCLUSION

For all of these reasons, the motions should be denied.


Respectfully submitted, this 26th day of January, 2015.

GORDON GOINES
By Counsel

_____/s/Timothy Coffield_____
Timothy Coffield (VSB 83430)
5374 Gordonsville Road
Keswick, VA 22947
(434) 218-3133 | tc@coffieldlaw.com
Counsel for Plaintiff Gordon Goines
Participating Attorney for THE RUTHERFORD INSTITUTE

## CERTIFICATE OF SERVICE

I certify that on January 26, 2015 and true copy of the foregoing was uploaded to the Court's CM/ECF system, which will provide electronic notice to the following:

Richard H. Milnor, Esquire (VSB #14177)
Zunka, Milnor & Carter, Ltd.
414 Park Street, P O Box 1567
Charlottesville VA 22902
Phone: 434-977-0191
Fax: 434-977-0198
rmilnor@zmc-law.com


Attorney for Robert Dean, David Shaw, and D.L. Williams

Rosalie Pemberton Fessier, Esquire
Timberlake, Smith, Thomas & Moses, P.C.
The Virginia Building
25 N. Central Avenue
P.O. Box 108
Staunton, Virginia 24402-0108
tel. 540-885-1517
fax 540-885-4537
rfessier@tstm.com


Attorney for Valley Community Services Board

James M. Bowling, IV
St. John, Bowling, Lawrence & Quagliana, LLP
416 Park Street  Charlottesville, Virginia 22902
Phone: (434) 296-7138
Fax: (434) 296-1301
jmb@stlawva.com


Attorney for Jenna Rhodes


BY:  ___/s/Timothy Coffield_____
        Timothy Coffield (VSB 83430)