IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| GORDON GOINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:14-cv-00065 |
| | ) | |
| VALLEY COMMUNITY SERVICES | ) | By: Elizabeth K. Dillon |
| BOARD, *et al.*, | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Pending before the court are five motions to dismiss, separately filed by all defendants in this case. Taken together, they seek dismissal of plaintiff Gordon Goines's complaint in its entirety. Goines has filed responses in opposition, and defendants have filed replies. The court heard oral argument on the motions, and they are now ripe for disposition. For the reasons set forth below, the motions will be granted.

**I. Background**

Goines's complaint alleges that he was unlawfully seized and detained by defendants, without probable cause and in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. He brings suit pursuant to 42 U.S.C. § 1983 and also asserts a state-law claim of false imprisonment. He names as defendants three officers with the City of Waynesboro Police Department (defendants David Shaw, Robert Dean, and D.L. Williams), the Valley Community Services Board (VCSB), and Jenna Rhodes, who is employed by VCSB as an Emergency Services and Intake Clinician. He lists John Does 1–10 as additional defendants.

Accepting the well-pleaded, nonconclusory factual allegations in the complaint as true, as this court must when ruling on a motion to dismiss, *see Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008), the facts of the case are as follows:

Goines suffers from cerebellar ataxia, a neurological condition that manifests itself in physical ways. (Dkt. No. 1, Compl. ¶ 14.) For example, the disorder sometimes makes it "difficult for him to maintain a normal upright posture when walking, causing him to walk with an unsteady, lurching gait." (*Id.* ¶ 15.) As a result of the condition, he also speaks slowly and "his speech is sometimes slurred." (*Id.*) He also struggles occasionally with fine motor skills such as writing and buttoning clothes. The effects of this condition are "purely physiological." (*Id.* ¶ 16.) It does not affect his cognitive functioning and he is mentally stable and has no "mental health issues." (*Id.*)

Goines resides in an apartment complex in Waynesboro. In the weeks leading up to May 15, 2014, he noticed a problem with his cable service. His television would intermittently disconnect throughout the day and would freeze and produce extremely loud line noise and signals. Goines had notified his cable service provider, Comcast, about the problem. (*Id.* ¶¶ 17–19.)

On May 15, 2014, Comcast sent a field tech to Goines's residence. The field tech examined the conjunction box outside his building and told Goines that one of his neighbors had spliced the cable running to Goines's apartment and was effectively stealing his cable. This was the cause of "the disconnections, loud line noise, and signals" that were coming through his television. (*Id.* ¶ 19.)

The field tech told Goines he could not fix the problem without entering the neighbor's apartment and that he was not legally authorized to do so. Instead, the field tech recommended that Goines notify the police of the cable theft. (*Id.* ¶¶ 20–21.)

That afternoon, Goines walked to the Waynesboro Police Department, which was across the street from his apartment, to report the cable theft. (*Id.* ¶ 22.) Goines told Officer Feazell he was uncomfortable confronting his neighbor because he was unsure how the neighbor would react, and further told Feazell he "did not want to 'get in a fight'" with the neighbor. Instead, he was reporting the theft to the police so that the police could handle it. (*Id.* ¶ 23.)

Feazell contacted two other officers, Shaw and Dean. An incident report prepared later by Shaw ("the Incident Report") reflects that Feazell advised Shaw and Dean that Goines "seemed to have some mental health issues going on over an issue with a television." (*Id.* ¶ 24.) Shaw and Dean approached Goines, and Shaw asked if they could go over to Goines's apartment so he could show them what was going on. (*Id.* ¶ 25.) Goines agreed, and the two officers followed Goines to his apartment. (*Id.* ¶¶ 25–26.)

According to the complaint, "Shaw and Dean apparently ignored or did not take the time to understand Goines' complaint." (*Id.* ¶ 26.) In the Incident Report, Shaw indicated that Goines told them "there was a clicking noise in the wall because someone outside was controlling his T.V." (*Id.*) Neither the officers nor Goines turned on the television at any point, however, and the officers never heard the line noise and signals. (*See id.* ¶ 27.) The Incident Report—which the court credits as accurate insofar as it does not conflict with the allegations in the complaint, *see* Section II.B. herein—describes that Goines "tried to get us to hear the noises he was but we didn't hear them and told him that." (Dkt. No. 12-3 at 3.)

Goines alleges that "[a]t no time did [he] make any threat to do harm to any person or to himself." (*Id.* ¶ 34.) The Incident Report, though, stated that Feazell told Shaw that Goines said he was "going to hurt somebody" (Dkt. No. 12-3 at 3), and Goines admits that when Officers Dean and Shaw asked him about fighting with his neighbors, he answered that he would "use his hands." (Dkt. No. 29 at 15–16.) When the officers asked Goines how he would "use his hands," Goines said "by punching." (*Id.*) Goines describes this exchange as a hypothetical conversation.

The officers asked Goines if he "had any mental health issues" or "had a doctor for issues." (Dkt. No. 1, ¶ 28.) Goines told them he did not. (*Id.*) Despite his response, Shaw and Dean concluded that Goines was "having irrational issues and hearing things." (*Id.* ¶ 29.) So Shaw asked Goines if he "wanted to talk to someone." (*Id.* ¶ 30.) By his question, Shaw intended to ask whether Goines wanted to talk to a mental health professional. Indeed, Goines does not dispute the accuracy of the Incident Report on this point, wherein Officer Shaw reported that he "told [Goines] there was concern for his and others safety and he needed to go talk to someone about all these problems. He agreed to go with Officer Dean to go speak to VCSB." (Dkt. No. 12-3 at 3.) Goines claims, however, that he understood Shaw to be asking if he wanted to talk to someone about the cable theft. In any event, Goines agreed to go with the officers. (Dkt. No. 1, ¶¶ 28–31.)

At that point, Shaw and Dean handcuffed Goines, took him back to the police station, and placed him into the caged portion of a police vehicle in the parking lot. (*Id.* ¶ 32.) Goines told Dean he wanted to go home and asked Shaw and Dean to let him out of the car, but Dean told Goines "that wasn't an option."[1] (*Id.* ¶ 33.) Goines's counsel agreed at argument that there may

---

[1] Virginia Code § 37.2-808(G), in effect in May 2014, permits an officer to take someone into custody and transport that person for an evaluation if he has probable cause to believe the person meets emergency custody criteria "based upon his observation or the reliable reports of others." The "criteria" for emergency custody are, in pertinent part, that "there is probable cause to believe that [the] person (i) has a mental illness and that there exists a

4

have been consent at the time Goines left the house with the officers, albeit consent based on a misunderstanding. But at the point that Goines stated he wanted to go home and the officers would not allow him, a seizure clearly occurred and had to be supported by probable cause.

Goines alleges that, upon information and belief, Dean or Shaw then placed a call to one of the John Doe defendants, who encouraged Shaw and Dean to take Goines into custody under Virginia laws involving mental-health evaluations. Dean and Shaw transported Goines against his will to Augusta County Medical Center [ACMC].[2] (*Id.* ¶¶ 35, 37.)

Dean or Shaw then placed a phone call to one of the John Does and requested a background check on Goines, which revealed that Goines had no criminal record, but that he owned a registered firearm. (*Id.* ¶ 38.) In response to questioning from Dean or Shaw, Goines explained he purchased the firearm in or around 2010 when he worked as a security guard, and that he kept the firearm locked in a safe at his residence. (*Id.*) Goines also told them that if there was a problem with the firearm, they could have it, and that he simply wanted to go home. (*Id.* ¶ 39.) Goines alleges that he repeatedly stated to Dean and others at the hospital that he wanted to go home. (*Id.* ¶ 40.) He claims that there was no legitimate or lawful basis to seize, arrest, or detain him.

At around 6:00 p.m., defendant Jenna Rhodes began an evaluation of Goines, acting as the designee and employee of VCSB. At approximately 6:15 p.m., Defendants John Doe 1—identified in the Incident Report as Officer Scott—and Williams came to the hospital and relieved Dean. (*Id.* ¶¶ 45–46.)

---

substantial likelihood that, as a result of mental illness, the person will, in the near future, . . . cause serious physical harm to . . . others as evidenced by recent behavior . . . threatening harm and other relevant information, if any, . . . (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment. Va. Code Ann. § 37.2-808(A).

[2] The complaint alleges that Shaw and Dean both transported Goines, although Shaw's Incident Report seems to indicate that only Dean transported Goines. (*See* Dkt. No. 12-3 at 3.) The court treats the complaint's allegations on this point as true. *See* Section II.B. herein.

At some point during Goines's detention at ACMC, Rhodes or a John Doe filed a petition seeking Goines's temporary detention and involuntary admission to a mental health facility pursuant to Virginia Code § 37.2-809.[3]  (*Id.* ¶ 47.)  Goines refers to the twelve-page document attached to his complaint as the May 15 Petition, but it is actually titled "Preadmission Screening Report" (Screening Report).  According to the complaint, the Screening Report alleged "(i) that Goines had a mental illness and was in need of hospitalization or treatment; (ii) that there existed a substantial likelihood that, as a result of mental illness, Goines would, in the near future, cause serious physical harm to others . . . ; and (iii) that Goines would suffer serious harm due to his lack of capacity to protect himself from harm or provide for his own basic human needs."  (*Id.* ¶ 49, and Ex. A.)

The Screening Report was completed by Rhodes and included a "diagnosis" that Goines had a "Psychotic Disorder NOS (298.9)."[4]  The complaint notes that "Rhodes has a master's degree in education" and "was not a licensed medical professional, clinical psychologist, or clinical social worker in Virginia or any other state."  (*Id.* ¶ 50.)  Goines contends that, by diagnosing him, she engaged in clinical psychology without being qualified to do so.  (*Id.* ¶ 51.)  It is undisputed, however, that Rhodes was an individual designated by VCSB to perform such evaluations, and Goines does not allege that she was not certified by Virginia to do so.

Goines alleges that, "[b]ased on the observations of [him] as set forth in the 'Preadmission Screening Report,' Rhodes lacked probable cause to believe that [he] had a mental

---

[3]  The temporary detention order issued later that evening notes that it was issued upon the magistrate's own motion and not by petition (Dkt. No. 1-2 at 1), but this factual dispute is not relevant to the analysis.

[4]  A "psychotic disorder: not otherwise specified" is a listing from the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 343 (4th ed. Text Rev. 2000).  It includes psychotic symptomatology, such as delusions and hallucinations, "about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder."  Five specific examples are listed that might qualify, including "persistent auditory hallucinations in the absence of any other features."  *Id.*

6

illness, or would cause serious harm to himself or others, or that he was in need of hospitalization."[5] (*Id.* ¶ 53.) The Screening Report contained other information and observations, including:

- that Goines "often displays inappropriate affect";

- that he appeared to "have delayed response";

- that he appeared "to respond to internal stimuli by his eyes darting about the room, as if responding to visual hallucination";

- that he appeared "disoriented as to time" (specifically, when asked the date, he said it was March 10 or 11, 2012, instead of May 15, 2014);

- that Goines had informed her that he had a "shrunken cerebellum" that was continuing to shrink;

- that he perseverated on the topic of his television and neighbors, insisting that his neighbors are controlling his television and noting that he sold a television because it wouldn't stop;

- that if he were released, "he will return home and assault his neighbors 'because I'm just tired of it'";

- that he had access to weapons, a fact she knew from one of the officers; and

- that the officers reported to Rhodes that Goines "made threats that he was going to assault his neighbors 'with my hands' and then later referenced 'taking care of it myself' with his Smith and Wesson firearm."

(*Id.* ¶¶ 49, 53 and Ex. A.)

---

[5] It is at least arguable that Goines, by including in his complaint the words "based upon the observations of [him] in the [Screening Report]," has adopted all of the observations in the report as true. Nonetheless, the court does not believe Goines's adoption of those facts is entirely clear and thus will not credit all of the observations in the report. Instead, for the reasons discussed in more detail in Section II.B. herein, the court does not credit as true the threat that Rhodes reported Goines made directly to her, since Goines flatly denies making any threats. Thus, the court does not consider the statement that, if he were released, he would return home and assault his neighbors. Significantly, however, Goines does not dispute that the officers told Rhodes that he had access to weapons or that the threatened to assault his neighbors. Thus, as noted in more detail in Section II.D herein, the court will treat the Screening Report as establishing that the officers made the statements to Rhodes that are contained in the report and will treat as true that the officers told Rhodes what the report says they told her. The one exception is the alleged comment that Goines would take care of it with his Smith & Wesson, since Goines expressly denies that he ever threatened to harm anyone with a firearm. (*See* Dkt. No. 29 at 16.) The court will not consider that comment.

The complaint alleges that Rhodes petitioned for Goines's detention at the request or instigation of one or more John Does, and that a magistrate issued a Temporary Detention Order (the May 15 TDO) based on the petition at 8:41 p.m. on May 15, 2014. (*Id.* ¶ 55 and Ex. B.) He argues that the order was based upon the "bare bones and conclusory" May 15 petition and Rhodes's report. (*Id.* ¶ 55.) Goines was subsequently transported, against his will and pursuant to the May 15 TDO, to Crossroads Mental Health Center, where he was held until his release on May 20, 2014.[6] He claims that he has no history of mental illness and has never been treated or sought treatment for mental illness, and that "[a]t no time has any person offered evidence that [he] has harmed or threatened to do harm to any person." (*Id.* ¶¶ 59–60.)

Goines's complaint contains two causes of action. The first, titled "Unlawful Seizure under the Fourth Amendment—Color of State Law" alleges that the actions of all the individual defendants violated Goines's rights under the Fourth and Fourteenth Amendments to the United States Constitution, giving rise to liability under 42 U.S.C. § 1983. (*Id.* ¶¶ 62–63.) He also asserts that VCSB should be held liable for the violation of his Fourth Amendment rights because it exhibited deliberate indifference to those rights. (*Id.* ¶ 66.) He bases his claim against VCSB on two grounds: (1) it had a policy and practice of "delegating authority and employing persons who are not sufficiently trained or educated" to make decisions regarding involuntary

---

[6] Although the complaint does not mention them, there were additional proceedings that resulted in Goines's lengthier detention. As reflected in the exhibits attached to Rhodes's motion to dismiss, Goines was examined by Dr. Bowmaster on May 16, 2014. He also found probable cause to believe that Goines had a mental illness and that, as a result of the illness, there was a substantial likelihood that he would, in the near future, cause severe physical harm to others. Also on May 16, 2014, a commitment hearing took place at which Goines was represented by counsel. At that hearing, a judge found by clear and convincing evidence that Goines met the criteria for involuntary admission and treatment. (*See* Dkt. No. 28-1 at 9–18, Exs. E, F, and G.) The court does not rely on these facts in ruling on the motion to dismiss, but notes the additional proceedings simply to explain the length of time that Goines was held. He does not challenge in this suit any of those additional proceedings, nor does he allege that his initial or subsequent detentions exceeded the time periods permitted by law. *See, e.g.*, Va. Code § 37.2-808 (setting forth time-frames for emergency custody orders and for temporary detention orders.)

8

admissions to mental health facilities; and (2) it failed to train and/or adequately supervise Rhodes. (*Id.*)

In his second cause of action, titled "False Imprisonment, State Law," Goines is unclear as to whom he is naming, referring only to "one or more Defendants—including, but not limited to Shaw, Dean, and Williams." (*Id.* ¶ 70.)

As noted, all of the named defendants have moved to dismiss the claims against them on various grounds. Each of defendants' arguments is discussed in context below.

## II. Discussion

### A. Rule 12(b)(6) Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, *i.e.*, the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

As to Goines's first claim, which asserts a cause of action pursuant to 42 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

To succeed on his state-law claim of false imprisonment, Goines must establish that a defendant restrained his liberty without any sufficient legal excuse. *Lewis v. Kei*, 708 S.E.2d

9

884, 890 (Va. 2011). Where a "plaintiff's [seizure] was lawful, the plaintiff cannot prevail on a claim of false imprisonment." *Id.*

### B. Consideration of Documents Outside the Complaint

Before turning to the merits of the dismissal motions, the court must first determine what documents it may consider, and which allegations in those documents must be accepted as true. Clearly, the court may consider both Exhibits A and B attached to the complaint (the Screening Report and May 15 TDO) without converting the motion to dismiss into a summary judgment motion. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007))).

The court may also consider a document outside the complaint if it "was integral to and explicitly relied on in the complaint" and there is no authenticity challenge. *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). On this basis, defendants urge this court to consider the Incident Report, which is attached as Exhibit C to the officers' respective motions to dismiss. (*See* Dkt. Nos. 12-3, 14-3, and 16-3.) As defendants correctly note, Goines both references and quotes from the Incident Report, although he does not attach it to his complaint. (*See, e.g.*, Dkt. No. 12 at 3 (arguing that Goines cannot "avoid the consequences of [the] entire document, as he attempts to do, by quoting from it selectively in his Complaint and not attaching the document as an exhibit".))

10

In these circumstances, ample authority supports allowing the court to consider the document when ruling on a motion to dismiss, without converting the motion to one for summary judgment. *See, e.g.*, *Sec'y of State for Defence*, 484 F.3d at 705 (when ruling on a motion to dismiss, a court "may consider documents . . . attached to the motion to dismiss, so long as they are integral to the complaint and authentic . . . .") (citations omitted); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (where plaintiff quotes selectively from a document in his complaint but does not attach it, the court may nonetheless consider it when ruling on a motion to dismiss); *Teagardener v. Republic-Franklin, Inc. Pension Plan*, 909 F.2d 947, 949 (6th Cir. 1990); *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 335 (E.D. Va. 2005); *Gasner v. Cnty. of Dinwiddie*, 162 F.R.D. 280 (E.D. Va. 1995.[7]

The more pressing question here is how to treat the statements in these various documents and particularly those that conflict with allegations in Goines's complaint. Defendants point to several Fourth Circuit cases stating the general rule that where there is a "conflict between the bare allegations of the Complaint and any exhibit attached to the Complaint, . . . the exhibit prevails." (*See, e.g.*, Dkt. No. 12 at 2 (quoting *S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)) and citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).) From this, defendants argue that the court must treat the allegations in the three documents as true, even if they are contrary to the complaint's allegations.

Goines acknowledges the general rule, but contends it is inapplicable here. He relies on two cases: (1) *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674–75 (2d Cir. 1995), in which

_____

[7] Some of these cases impose an additional requirement that there be no dispute regarding the document's authenticity or that it has been falsified. Goines has not alleged that the report is falsified or not authentic.

the court reasoned that "a libel plaintiff could attach the allegedly libelous writing without risk that the court will deem true all libels in it" and concluded that the plaintiff's act in attaching an investigative report that cleared the defendants of wrongdoing did not require the court to treat the substance of the report as true; and (2) *Great N. Ins. Co. v. Recall Total Info. Mgmt.*, No. TDC-13-1829, 2014 WL 5298014 (D. Md. Oct. 14, 2014), where the court concluded it was not "required to accept as true the arguably self-serving statements of [the defendants] to the [Maryland Occupational Safety and Health (MOSH)] investigator, as recounted in the MOSH report, simply because the report was attached to the Complaint." *Id.* at *2 n.3. Defendants counter that these cases are distinguishable because they involved statements *by defendants*, while here they seek to rely primarily on alleged statements *by plaintiff* contained in the attached exhibits.

Goines has the stronger argument on both points. First, the court agrees with him that not all of the allegations in the attached documents must be treated as true. That conclusion is supported not only by *Gant* and *Great N. Ins. Co.*, but also more directly by the Sixth Circuit's decision in *Jones v. City of Cincinnati*, 521 F.3d 555 (6th Cir. 2008), which has been adopted by two judges of the United States District Court for the Eastern District of Virginia. *See Moody v. City of Newport News, Va.*, __ F. Supp. 3d __, 2015 WL 1347475 (E.D. Va. March 25, 2015) (Davis, J.); *Pinder v. Knorowski*, 660 F. Supp. 2d 726 (E.D. Va. 2009) (Morgan, J.).

The plaintiffs in *Jones* were relatives and representatives of Nathaniel Jones, a man who died after Cincinnati police officers subdued and placed him under arrest. 521 F.3d at 557. They brought Fourth and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983 against the officers. The district court denied a Rule 12(b)(6) motion to dismiss and specifically denied the officers qualified immunity. *Id.*

12

The *Jones* plaintiffs had included as exhibits to the complaint a series of transcripts of an investigator's interviews of the officers who had subdued Jones and excerpts from the investigative report on the incident. *Id.* at 561. On appeal, the defendants argued that because those documents were attached to the pleading, all the facts stated in the exhibits to the complaint must be assumed to be true for purposes of the motion to dismiss. *Id.* The court flatly rejected that argument, reasoning:

> [T]reating a transcript as part of a pleading does not mean that we assume everything the officers said in those interviews is true. Where a plaintiff attaches to the complaint a document containing unilateral statements made by a defendant, where a conflict exists between those statements and the plaintiff's allegations in the complaint, and where the attached document does not itself form the basis for the allegations, Rule 10(c) "does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact." . . . Rather, we treat the exhibit as an allegation that the officers made the statements in the transcript and we treat that allegation as true.

*Id.* (internal quotations and citation omitted). It thus explained that the transcript attached to the complaint required the court to accept as true that a defendant said "X," but it would not require the court to accept that "X" itself is true. *See id.*

As noted by the Eastern District of Virginia in *Moody*, the Fourth Circuit has not expressly recognized this exception to the general rule regarding conflicting exhibits. 2015 WL 1347475, at *7. Other circuits, however, are in accord with *Jones*. *See, e.g.*, *West-Anderson v. Mo. Gaming Co.*, 557 F. App'x 620, 622 (8th Cir. 2014) (unpublished) (statements made by police officers in their reports, which were attached to but contradicted allegations in the plaintiff's complaint, "were not entitled to a presumption of truth in assessing the basis of [the officers'] knowledge at the time of arrest or whether probable cause existed"); *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454–56 (7th Cir. 1998) (stating that "Rule

13

10(c) does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact[,]" and distinguishing documents that form the basis for the allegations, such as a contract in a breach of contract claim, from those that do not).

Moreover, *Moody* and *Pinder* expressly adopted the reasoning of *Jones,* applying it to situations similar to the facts here. In *Pinder*, the plaintiff was asserting claims of false arrest and malicious prosecution against an officer on the grounds that the plaintiff was handcuffed and a protective sweep of his residence occurred before any search warrant was obtained. 660 F. Supp. 2d at 736. The plaintiff had attached to his complaint an affidavit prepared by one of the defendant officers during the plaintiff's subsequent prosecution. The affidavit stated that the officer had not placed handcuffs on the plaintiff and that he conducted only a brief protective sweep. *Id.* The defendant there, like defendants here, relied on the authority stating that where there is a conflict between the allegations of a complaint and an attached exhibit, the exhibit prevails. *Id.* The court noted that the defendant correctly stated the law, but "err[ed] in applying it to the case at hand." *Id.* It explained that the plaintiff did not attach the "affidavit to prove the facts in the affidavit, but rather to support the allegations in his Complaint." *Id.* at 737. The court reasoned that "[t]o take [the defendant's] 'untested self-serving assertions' as true and use them to dismiss [p]laintiff's claim . . . would make little sense." *Id.* (quoting *N. Ind. Gun & Outdoor Shows, Inc.*, 163 F.3d at 56.)

Likewise, in *Moody*, the court followed the reasoning of *Jones* and *Pinder* and concluded that it would not accept as true the factual account of the incident at issue contained in a police department report. 2015 WL 1347475, at *8. The court treated the exhibit simply as an allegation that the police made a report concerning the incident, but would "not accept as true the

14

factual account of the incident stated in the report" and would instead "resolve any inconsistency between the exhibits to the Complaint and the factual allegations in the Complaint itself in favor of the Complaint." *Id.*

This court finds the reasoning of *Jones*, *Moody*, and *Pinder* persuasive and believes it is applicable here. That is, it makes "little sense" to bind the plaintiff to exculpatory statements and the defendants' factual version of events contained within an exhibit to the complaint, at least where the complaint itself contains factual allegations that contradict those assertions. *See Moody*, 2015 WL 1347475, at *8; *Pinder*, 660 F. Supp. 2d at 737. Such documents are different in kind from a contract that forms the basis of the plaintiff's claims or is supposed to confer standing, in which case it makes sense to apply the general rule of allowing the exhibit to control.

The court is also not persuaded by defendants' argument that they are relying on statements made *by Goines* and thus that the *Jones* exception is inapplicable. (*See* Dkt No. 32 at 3–5.) The statements in the Incident Report, Screening Report, and May 15 TDO are *defendants'* account of what Goines did or said, at least some of which he disputes in his complaint. They are no different than, for example, the police report in *Moody*, which referred to furtive movements by the civil plaintiff that caused the police to shoot into his vehicle, but where the complaint alleged that he "at no time reached into a console or glove box, into his coat, or made any other furtive motion." 2015 WL 1347475, at *8. As such, they need not be treated as true when ruling on a motion to dismiss.

Accordingly, the court will apply the *Jones* exception to the general rule here in determining what facts from those documents must be considered as true when ruling on the motions to dismiss. To the extent that the complaint expressly conflicts with, or contradicts any

15

factual allegations in the Screening Report, May 15 TDO, or Incident Report, the court will not treat the allegations in the exhibits as true for purposes of the Rule 12(b)(6) motions and will instead credit the allegations in the complaint itself.

### C. Motions of Dean, Shaw, and Williams

Dean, Shaw, and Williams have filed substantially similar motions to dismiss in which they raise four basic arguments. First, they claim that the complaint (with Exhibit A and Exhibit B) fails to state a claim upon which relief can be granted. Second, they claim that they are entitled to qualified immunity as to both claims in the complaint. Third, they argue that they are entitled to sovereign immunity as to the false imprisonment claim. Fourth and finally, they contend that if the court dismisses the § 1983 claim but does not dismiss the false imprisonment claim against them, the court should decline to exercise supplemental jurisdiction over the state-law claim and should dismiss that claim without prejudice.[8]

As the court discusses in more detail below, Dean, Shaw, and Williams are entitled to qualified immunity as to Goines's § 1983 claims because the allegations in the complaint do not establish that they violated Goines's clearly-established constitutional rights.

### 1. Qualified Immunity and Probable Cause

Under the doctrine of qualified immunity, government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

---

[8] Williams raises additional arguments specific to him. In particular, Williams argues that there are even fewer allegations of his involvement. He is named in only two paragraphs in the complaint, and, as indicated both in the complaint and supported by the Incident Report, he had only minimal involvement in the May 15, 2014 events involving Goines. Williams came to the hospital at around 6:15 p.m. while Rhodes was performing her evaluation of Goines, and he relieved Dean. Williams also executed the May 15 TDO issued by Magistrate Hailey, by serving it on Goines and transporting him for additional evaluation. Williams argues that any detention by him after he came on duty prior to the TDO is supported by the probable cause reflected in Rhodes's assessment and then that the TDO issued by magistrate Hailey at 8:41 p.m. provided a legitimate and lawful basis for any seizure, detention, and transportation by him. In light of the court's conclusions that the officers who initially seized Goines are entitled to qualified immunity and that Rhodes's petition to the magistrate was supported by probable cause, the court does not parse out the claims against Williams so finely. He is the beneficiary of the court's analysis both with regard to Shaw and Dean prior to the TDO and its analysis as to Rhodes.

16

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009). Such an official will be protected by qualified immunity if his actions were objectively reasonable. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013). It is important to resolve the issue of qualified immunity "early in the proceedings" because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

Qualified immunity generally involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that the defendants' conduct violated a constitutional right; and if so, (b) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Under *Pearson*, the court need not address the first prong of the qualified immunity analysis in all circumstances, but may exercise its discretion and look to the second prong. 555 U.S. at 236-37. Doing so may be appropriate, for example, "[w]hen qualified immunity is asserted at the pleading stage" and "whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." *Id.* at 239 (quoting *Dirrane v. Brookline Police Dept.*, 315 F.3d 65, 69-70 (1st Cir. 2002)). In this case, the court exercises its discretion to address only the second prong of the analysis, *i.e.,* whether the facts alleged show a violation of Goines's clearly established constitutional rights.

17

As to this second prong, a law enforcement officer is not expected to know all of the legal limits of well-known constitutional rights; the officer is entitled to immunity if a reasonable officer would not have understood that what he is doing violates the plaintiff's constitutional rights. *Anderson*, 483 U.S. at 638-39. As stated by the United States Supreme Court in *Malley*, "if officers of reasonable competence could disagree" on whether the action was reasonable, immunity should be granted. 475 U.S. at 341; *Springmen v. Williams*, 122 F.3d 211, 214 (4th Cir. 1997). Under this standard, all but the "plainly incompetent or those who knowingly violate the law" are protected. *Malley*, 475 U.S. at 341.

At the time of Goines's seizure, it was well established that the officers had to have "probable cause to seize [him] for an emergency mental evaluation." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003); *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 968 (4th Cir. 1992) (en banc) ("the general right to be free from seizure unless probable cause exists [is] clearly established in the mental health seizure context"). But the court must "look not to whether the right allegedly violated was established 'as a broad general proposition' but whether 'it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'" *Raub v. Campbell*, __ F.3d __, 2015 WL 1926416, at *4 (4th Cir. April 29, 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *as modified by Pearson*, 555 U.S. 223; and citing to *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 266 (4th Cir. 1998) (*Takoma Park*)).

As described by the Fourth Circuit in *Bailey*,

> Probable cause is a "practical, nontechnical conception" that addresses the "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates,* 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983) (quotation marks omitted). It is a "fluid concept" that cannot be "reduced to a neat set of legal rules." *Id.* at 232, 103 S. Ct. 2317. We have previously held that in the case of the law governing seizures for psychological evaluations, there is a

18

> "lack of clarity" as far as what constitutes probable cause. *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir.1992).

*Id.* at 739. The probable cause inquiry under the facts of this case is also less than clear. The Fourth Circuit very recently stated, in a case involving a person feared to be a danger to others, that "all of our decisions involving mental health seizures have involved circumstances in which law enforcement officers seized an individual because they feared he or she might be a danger to him- or herself." *Raub*, 2015 WL 1926416, at *5.

The officers here are entitled to qualified immunity if a reasonable officer would not have known that probable cause was "clearly" lacking under the facts of this case. *Bailey*, 349 F.3d at 741 (4th Cir. 2007) ("A right is 'clearly established' if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right.") (citations and internal quotations omitted); *Saucier*, 533 U.S. at 202 (the "particularized" right must have been clearly established and the "relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

Because the reasonableness of the defendants' beliefs is judged from an objective standard in light of the clearly established law at the time of the defendants' exercise of discretion, *Anderson*, 483 U.S. at 639, the inquiry of the court under such circumstances "must be filtered through the lens of the [defendants'] perceptions" at the time of the exercise of discretion. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). This prevents judging the reasonableness of the defendants' actions "with the benefit of 20/20 hindsight" and "limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the [defendants] reasonably perceived." *Id.*

An examination of existing case law, "at the appropriate level of specificity," *Smith*, 749 F.3d at 308, and of the officers' perceptions of the facts, is required to determine what a reasonable officer in the position of the defendant officers would have understood about their actions.

### 2. Relevant Case Law

There are five principal Fourth Circuit cases that have addressed whether officials had probable cause to seize a person for a mental evaluation, or were entitled to qualified immunity in that circumstance. First, in *Gooden v. Howard County*, police officers responded to a 911 call reporting loud screaming and yelling. 954 F.2d 960. They initially made contact with Gooden, but she denied being the source of the commotion. They returned about one week later on similar reports of a long, blood-chilling scream coming from Gooden's apartment. As they approached her door, they heard a scream from within. She initially denied any knowledge of the noise, but later said she yelped after accidentally burning herself on an iron. She declined assistance and asked the officers to leave. *Id.* at 962-63.

Then, while interviewing the complaining neighbor, the officers themselves heard loud thuds and additional screaming from Gooden's apartment, which involved varying voice tones and which the officers thought might be the product of multiple personalities. They returned to her apartment and Gooden appeared to have been crying and was acting "strangely." *Id.* at 963. The officers believed she might be a danger to herself, and detained her for a mental examination in reliance upon state statutory law, *id.* at 966. A doctor found no sign of mental illness and released her. *Id.* at 964.

The Fourth Circuit ultimately ruled that the officers were entitled to qualified immunity, reasoning that "where officers are hurriedly called to the scene of a disturbance, the

20

reasonableness of their responses must be gauged against the reasonableness of their perceptions, not against what may later be found to actually have taken place." *Id.* at 965. Notably, while Gooden's behavior was certainly strange, she made no verbal threats to herself or others. Rather, the officers' perceptions, based upon their observations, even if mistaken, reasonably led them to believe that she was mentally ill and that she might be a danger to herself.

Similarly, in *Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2011), the Fourth Circuit concluded that police officers who had taken the plaintiff into custody for a mental health evaluation were entitled to qualified immunity. There, the officers were told by the police dispatcher that Cloaninger had threatened suicide and that they were to conduct a welfare check at his house. In fact, however, Cloaninger had called the Veterans Administration ("VA") that morning not to report suicidal feelings, but merely to report that he was experiencing symptoms of "trembling and feeling nauseous and flighty, which he attributed to an adverse reaction to his prescription medication." *Id.* at 328. The person he spoke with told him that she was sending help to take him to a nearby hospital until he was stabilized and that he would then be transferred to the VA hospital. *Id.*

When the officers arrived and told Cloaninger that they were there to check on him, he demanded they get off his property. The officers then learned from another officer that Cloaninger had made prior suicide threats and, when officers had responded on that occasion, firearms had been found at the residence. Cloaninger denied he had any firearms in his residence on the date of the incident at issue, but he did not dispute that the officers were informed of his prior possession of firearms. *Id.*

A supervisor came on site and attempted to communicate with Cloaninger, both through the doorway and by telephone. Cloaninger demanded he be taken to the VA hospital and

insisted that the officers leave his property if they were not going to take him. The supervisor spoke with a nurse at the VA who was familiar with Cloaninger, and she confirmed both the past suicide threats and agreed that an emergency commitment would be an appropriate measure. *Id.* at 328–29, 332–33. Additionally, the Fourth Circuit described his behavior as "not responsive to [the officers'] concerns for his well-being." *Id.* at 332.[9]

In that case, the officers were entitled to qualified immunity because their belief that they had probable cause did not violate clearly established law. There, the probable cause determination was based on a report of a prior suicide threat, their belief that Cloaninger had firearms at his disposal previously, and the fact that he was not responsive to the officers' concerns for his well-being. The officers also were able to speak with a nurse who had experience treating Cloaninger and confirmed that he had previously threatened suicide, and they obtained her agreement that emergency commitment was appropriate.

*Takoma Park* is another instructive case. 134 F.3d 260. There, a husband and wife were fighting and the husband left the house and later contacted the police department, asking that officers go to his home to check on the possibility that his wife may be suicidal. The wife was "visibly agitated and crying" about a "painful argument" she had with her husband. *Id.* at 264. She advised the responding officers that "if it was not for her kids, she would end her life." *Id.* Without her consent, the officers detained her and took her for a mental evaluation. Although she was ultimately determined not to be subject to continued detention, the Fourth Circuit held the officers who had detained her were entitled to qualified immunity because she did not allege facts demonstrating the violation of clearly established law. *Id.* at 265.

---

[9] The officers had offered testimony in support of their summary judgment motion that Cloaninger was in fact abusive and threatened to kill them all and kill himself if they did not leave his property. But Cloaninger denied that he was abusive or belligerent, or that he threatened them. *Id.* at 328, 332. The Fourth Circuit therefore did not consider his alleged threats or abusive behavior when addressing whether the officers had probable cause to seize him. *Id.* at 332.

22

The fourth case that warrants discussion is *Bailey*, 349 F.3d 731, where the court affirmed the district court's ruling denying qualified immunity to the defendant officers who had seized the plaintiff for an emergency mental evaluation. In that case, the officers had received a 911 call from a neighbor stating that Bailey was intoxicated and had told her he was going home to commit suicide. *Id.* at 734. One of the officers arrived at the home and Bailey answered the door. He admitted the officer into the house and returned to sit at the dining table where he was eating lunch. He answered questions of the officer and denied any thoughts of suicide. *Id.*

Bailey asked the officer to leave and escorted him out of the house and closed the front door. The officer did not voice any objection. At about the same time, a second officer arrived and knocked on the door, after the first officer possibly said, "we're going to have to do something." *Id.* at 735. Bailey opened the door, but told the second officer that the suicide report was "crazy," that the officers needed to leave, and that he was going to call his lawyer. *Id.* As Bailey went to close the door, the second officer placed his foot in the doorway to prevent the door from closing and grabbed Bailey's arm. The officers subsequently tackled him, handcuffed him, and kicked and punched him.

The Fourth Circuit concluded that probable cause was lacking, and that it was clearly established that probable cause was lacking in the circumstances, because the only evidence that the officers had that Bailey was suicidal was the 911 call, and nothing that they saw or observed confirmed that report. *Id.* at 740, 741. The court rejected the officers' contention that, because the neighbor's 911 report asserted that Michael was at home, intoxicated, and suicidal, and because they had confirmed both that he was at home and that he was intoxicated, they had probable cause to believe Michael was a danger to himself. *Id.* at 740. The court distinguished the case before it from both *Gooden* and *Takoma Park* on the grounds that in those cases, the

23

officers had additional or more significant information, much of it from personal observations, that supported probable cause. *Id.* at 740–41. In *Bailey*, by contrast, there was only a 911 report and nothing the officers observed supported the notion that Bailey was suicidal.

Finally, the Fourth Circuit just last week issued its opinion affirming summary judgment for a mental health prescreener on the basis of qualified immunity in a case involving a mental health evaluation seizure where a person was feared to be a threat to others. *Raub*, 2015 WL 1926416. While defendants here could not have relied upon or been informed by the decision in *Raub*, the conclusion of the court there further supports this court's determination that the defendant officers are entitled to qualified immunity, particularly because *Raub* involved potential harm to others.

In *Raub*, a former Marine posted threatening messages on Facebook that so concerned some of his friends that they contacted the FBI. *Id.* at *1. The posts included seeking revenge, "gunning whoever run this town," arresting former Presidents, and leading a revolution. FBI agents and local law enforcement visited Raub at his home. *Id.* at *1. He agreed that the posts were his, but he did not threaten violence in speaking with the officers and refused to answer questions about whether he intended to commit violence in the future. *Id.* at *2. He was reported to have wildly shifting mood swings. *Id.* Upon advice of Campbell, a certified mental health prescreener, the officers took him into custody for an evaluation. *Id.* Campbell's evaluation noted Raub's mood swings and that he was preoccupied and distracted, had roving and intermittent eye contact, and felt justified in following through with threats. There was also concern about Raub's access to weapons. *Id.* After performing the evaluation, Campbell petitioned for and received a temporary detention order from a magistrate judge. *Id.* at *3.

24

The *Raub* court discussed the same cases that this court has discussed above (*Bailey*, *Cloaninger*, *Gooden*, and *Takoma Park*), and summarized that

> none of these cases delineate the appropriate standard where a mental health evaluator must decide whether to recommend a temporary detention on the belief that an individual might be a danger to others. They certainly do not speak to the necessity, length, and substance of a psychological evaluation, nor to the evidence needed to support probable cause in such a circumstances.
>
> Nonetheless, to the extent the cases should have informed Campbell's conduct, they support the view that he acted reasonably under our prevailing legal standards.

*Id.* at *6. The panel then reasoned that it was "doubtful that Campbell violated Raub's Fourth Amendment rights based on our existing precedent," but in any event determined he was "entitled to qualified immunity on the ground that the unlawfulness (if any) of his conduct was not clearly established at the time he recommended Raub's seizure." *Id.* at *7.

As discussed in more detail in the next section, this case is closer to *Takoma Park*, *Gooden*, *Raub,* and *Cloaninger* than *Bailey*.  Here, like in the first four cases, the defendants' own observations and interactions with Goines and reliable information provided by others, served as the basis for their belief that a seizure for a mental health evaluation was supported by probable cause.   The court turns next to those observations and the officers' reasonable perceptions of the situation they faced.

### 3.  Shaw's & Dean's Perceptions of the Facts

It is important to note that Goines was not seized by Shaw and Dean, for Fourth Amendment purposes, until he was in the caged area of the police car and first asked to go home. Before asking to go home, Goines admits he went voluntarily with Dean and Shaw to "talk to someone."  Although he claims that he and the officers misunderstood each other, he admits that

he initially agreed to go with them. In light of all that had happened up to that point, the court concludes that an objectively reasonable officer would believe Goines was consenting to go talk with someone about mental health issues, even if that was not Goines's understanding at that time. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (citations omitted)).

The court turns next to the facts known to the officers at the time of Goines's seizure. At the time of Goines's seizure (for purposes of the motion to dismiss), Shaw and Dean knew: (1) Goines reported hearing noises that they could not hear; (2) Goines repeatedly told them that he believed "someone outside was controlling his T.V."; (3) Goines told them that he did not want to get in a fight because he did not want anyone to get hurt, and that, if he did get in a fight, he would use his hands to hurt his neighbor by punching him;[10] and (4) in response to Shaw's question as to whether Goines "wanted to talk to someone about all these problems," Goines stated that he did. The officers also knew that Goines was concerned enough about his neighbors "controlling his television" to come to the police station and report it to the police. Additionally, when Dean and Shaw first received the report of his complaint, Officer Feazell had conveyed his own impression that Goines "appeared to have some mental health issues going on." All of these are facts admitted by Goines in his complaint.[11]

---

[10] Goines admits he said these things in response to questions posed by the officers, but denies that they constitute a "threat." In his briefing, Goines also suggests that the questioning was somehow improper, arguing that Dean and Shaw were more concerned with "interrogat[ing]" Goines than in understanding his problem. (Dkt. No. 29 at 4.) The court disagrees that the officers acted improperly by asking Goines to clarify his earlier comment to Officer Feazell, a comment plaintiff includes in his complaint. Dkt. No. 1, at ¶ 23 ("Goines told Frezell he did not want to 'get in a fight' with the neighbor."). Once the officers believed Goines might have a mental illness, it was prudent of them, given the statutory requirements, to ascertain whether he might pose a threat to himself or others.

[11] The defendant officers repeatedly point to other information contained in Rhodes's report, including references to Goines's owning a gun or any statement by Goines that he was going to use his "Smith & Wesson 'to

26

Goines has now offered what he says is the accurate interpretation of his behavior and comments. But an officer's assessment of whether probable cause existed is not viewed with the benefit of hindsight, but upon the totality of the circumstances known to the officer at the time of the arrest or seizure. *Brown v. Gilmore*, 278 F.3d 362, 367, 370 (4th Cir. 2002); *see also Gooden*, 954 F.2d at 965-66. With the benefit of hindsight, and knowing now that Goines was attempting to explain that he thought his neighbor was stealing cable, the officers might well have reached a different conclusion. There is no evidence, however, that the officers understood his complaint in that way at the time.

Moreover, a careful examination of each of the above observations shows how the officers were at least objectively reasonable in believing that these facts supported probable cause for emergency custody of Goines and thus are entitled to qualified immunity. First, as to his reporting noises they could not hear, Goines does not dispute that the officers did not hear the noises he told them about. It was reasonable based on this for the officers to believe he was having auditory hallucinations, which are commonly associated with mental illness.

Second, Goines repeatedly told the officers that he believed "someone outside was controlling his T.V.," which he does not deny saying. Nor does he allege that he ever communicated directly that someone was stealing his cable. Perhaps Goines was trying to explain that a neighbor was stealing his cable, but that idea was certainly not conveyed by either

take care of it,'" with "it" being a reference to the problem with his neighbors. The information concerning Goines's firearm, however, was not known to the officers at the time of the initial seizure and thus may not be considered in determining whether or not that seizure was supported by probable cause. *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003) (in determining whether there was probable cause supporting his detention, the court may consider only those "facts and circumstances known to the officer at the time of the [seizure]") (alterations and citation omitted). Moreover, Goines flatly denies making any such threats. (*See, e.g.*, Compl. ¶ 34 ("At no time did Goines make any threat to do harm to any person or to himself."); *cf. id.* ¶ 60 (no person "has offered evidence that Goines was harmed or threatened to do harm to any person"); Dkt. No. 36 at 14 (denying the alleged threats including those involving "taking care of it [him]self with his firearm")). As the court has already ruled, it will not credit as true factual allegations in attached exhibits where those statements are denied in the complaint. Consideration of the statements regarding him using his hands to punch and hurt someone does not violate this rule, because Goines admits making these statements. (*See, e.g.*, Dkt. No. 29 at 15-16.) He simply denies that they were a threat. (*Id.*)

27

his initial report or his later discussions with the officers. Indeed, such an allegation does not appear at any place in the Incident Report or Screening Report. Neither document contains any reference to his cable line being spliced or his cable being stolen, but both refer to his making statements about his neighbors "controlling" his television. There is a marked difference, for purposes of determining whether someone might have a mental illness, in saying "someone is controlling my television" and "someone is stealing my cable and it is resulting in clicking noises on the audio signal of my television."

Given what the officers heard Goines repeatedly say, which was that someone was controlling his television, they were objectively reasonable in thinking it sounded like he was experiencing paranoia. Indeed, as explained in the Incident Report, in the view of the officers, "[t]here was no reasonable explanation that he was being messed with but rather was having irrational issues and hearing things. There was reason to be concerned because he was displaying paranoia over people controlling his television, [and] hearing this clicking noise in the wall, even though we didn't." (Dkt. No. 12-3 at 3.)

Based on this conduct, as well as the fact that Goines initially expressed what the officers reasonably believed to be consent to go talk with someone about his mental-health issues (which itself could lead a reasonable officer to believe that treatment is needed), the court concludes that it was objectively reasonable for the officers to conclude that there was probable cause to believe Goines was suffering from a mental illness.

The officers also had an objectively reasonable belief that there was probable cause to believe Goines posed a threat to others. Goines has admitted that he first told Feazell that he did not want to get into a fight with a neighbor. He also admitted that, in response to questioning, he told police that if he did get into a fight, he would use his hands to punch the neighbors. As

28

explained in more detail in the Incident Report, this conversation also included Goines's saying that he would not "want to kill them just hurt them." (Dkt. No. 12-3 at 3.)[12] These facts, particularly when coupled with the officers' reasonable interpretation of his conduct, which was that he was hearing things that were not there and believed people outside of his apartment were controlling his television, could lead a reasonably prudent officer to believe that Goines was likely to hurt someone.

Goines emphasizes, though, that he was speaking hypothetically. That is, he was trying to say that he did *not* want to hurt anyone and that was why he contacted the police. But even a statement that he "did not want to hurt anyone" could easily be interpreted by police as him saying he would be forced to hurt his neighbor, or feel compelled to do so, if the police did not assist him. In *Takoma Park*, the Fourth Circuit held that the officers' detention of the wife based on her similarly "hypothetical" statement of intent to harm herself did not violate clearly established law. *See* 134 F.3d at 264 (woman's statement that "if it were not for her kids, she would end her life," after husband's 911 call that he believed his wife might be suicidal, was sufficient for officers to reasonably believe they had probable cause to seize her).

*Gooden, Cloaninger,* and *Raub* also support a finding of qualified immunity here because in all of those cases, the officials were entitled to qualified immunity despite observing or hearing no threats, or no immediate threats in the case of *Raub*, from the plaintiffs. Gooden made no threats to herself or others, but, because of her screams and strange behavior, the officers reasonably believed she posed a danger to herself. Cloaninger did not make threats to himself or others, but a VA doctor reported him as suicidal by mistake. This, coupled with information about prior suicide threats provided to the officers, and Cloaninger's unwillingness

---

[12] As noted *supra* at notes 10–11, Goines's complaint does not expressly deny making these statements; rather, he denies that they were a threat.

to answer questions, was sufficient for qualified immunity. Raub's threats were posted over several months and were not directed to anyone specifically, but were directed to others. When speaking with officials, Raub made no current threats. Here, Goines was generally cooperative and the threat-like statements he made were in response to questions posed by the officers. The statements were specifically directed to Goines's neighbors. Even if these threats were only meant to be hypothetical, the officers could reasonably believe that Goines would literally take matters into his own hands because the officers could do nothing to assist Goines with the neighbor controlling his television. In light of the lack of threats to others, and lack of verbal threats by the plaintiffs in *Cloaninger* and *Gooden*, and only a hypothetical threat in *Takoma Park*, where all the officers nonetheless were entitled to qualified immunity, Goines's statements, coupled with what the officers reasonably believed to be auditory hallucinations and paranoid thinking, were sufficient to confer qualified immunity here, as well.

The court also concludes that this case is distinguishable from *Bailey*. In *Bailey*, the officers personally observed nothing that suggested that Bailey was suicidal. He did not appear to be upset, he was cordial to the first officer who arrived, and he was simply sitting at a table eating lunch, albeit intoxicated. This is a far cry from the observations of the officers here of Goines, which (as already discussed) could have led them to believe he was experiencing both auditory hallucinations and paranoia, and that he might get into a physical altercation with his neighbors (and punch them) if the problem with his television was not resolved.

To summarize, the facts facing Dean and Shaw would not have made it "clear" that probable cause was lacking under the applicable law. Instead, at the time of the seizure, reasonable officers knowing what Dean and Shaw knew could have believed that they had probable cause to seize Goines for a mental health evaluation. The officers' decision to seize

Goines was, at worst, a bad guess in a gray area. *See Takoma Park*, 134 F.3d at 266 ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992))). Accordingly, even if probable cause was in fact lacking, the court finds that the named officers—Shaw, Dean, and Williams—are entitled to qualified immunity and any claim for damages against them will be dismissed.[13]

The court briefly addresses two additional arguments raised by Goines. First, Goines emphasized in his briefing and at argument that he believes the officers did not take the time they should have to understand his complaints or to actually do a thorough investigation. He repeatedly urges that the officers should have inquired more into his medical history or taken more time to understand him and his allegations about his television, but those actions are not required by law. As the Fourth Circuit has explained, while "[a]n officer may not disregard readily available exculpatory evidence that he knows about, the failure to pursue potentially exculpatory leads will not negate probable cause." *Anderson v. Caldwell Cnty. Sheriff's Office*, 524 F. App'x. 854, 861 (4th Cir. 2013) (citing *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000)).

Goines also argues that the officers attributed or misinterpreted some of the physical manifestations of his disability as signs of mental illness. There is no evidence to support this argument, though. The Incident Report contains no references at all to any of the outward physical signs of Goines's neurological disorder, *e.g.*, his slurred or slow speech or his atypical

---

[13] Qualified immunity would not prevent the granting of injunctive relief, which plaintiff has sought here. (Dkt. No. 1, at 15.) Nonetheless, even assuming Goines had stated a constitutional injury in this case, injunctive relief would be appropriate only if he could show a "sufficient likelihood that [he would] again be wronged in a similar way." *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). That is, he must show a real or immediate threat of future detention without probable cause to have standing to petition for injunctive relief. *See Raub*, 2015 WL 1926416, at *8 (citing *Lyons*, 461 U.S. at 111-12). Goines has not alleged a likelihood or threat of future detention, so the claim for injunctive relief against the officers will be dismissed without prejudice.

gait. Instead, it references what he said and did, not what he looked like or how he moved. Likewise, Rhodes's Screening Report, although it contained more references to physical symptoms (such as his eye movement), more often refers to his behavior (such as perseverating on the topic of his neighbors and the television) and to his statements than to any physical manifestations of his disability.

For the foregoing reasons, the court concludes that the officer defendants are entitled to qualified immunity as to Goines's constitutional claims against them. Thus, Goines's § 1983 claim will be dismissed with prejudice. As to the false imprisonment claim, the court declines to exercise supplemental jurisdiction over this claim and will instead dismiss it without prejudice. *See* 28 U.S.C. § 1367(c)(2).

### D. Motion of Rhodes[14]

As to plaintiff's claim against defendant Rhodes, the court concludes that it, too, is subject to dismissal. First, as both Rhodes and VCSB note, the fact that a magistrate relied on the information Rhodes presented and determined that it provided probable cause to support the issuance of a temporary detention order, creates a rebuttable presumption that probable cause existed. *See Torchinsky v. Siwinski*, 942 F. 2d 257, 262 (4th Cir. 1991) (in the analogous context of a police officer swearing out an affidavit to obtain an arrest warrant, a finding by a magistrate that probable cause exists creates a presumption of objective reasonableness and that the officer who swore out the affidavit to obtain the warrant had probable cause); *cf. Raub v. Campbell*, 3 F. Supp. 3d 526 (E.D. Va. 2014), *aff'd,* 2015 WL 1926416 (holding a mental-health evaluator, like Rhodes, was entitled to qualified immunity on a claim by an individual who the evaluator had

---

[14] One of Rhodes' arguments is that the claim against her should be dismissed because she did not physically seize Goines for Fourth Amendment purposes. (Dkt. No. 28 at 8). The Fourth Circuit in *Raub* rejected a similar argument, noting that Section 1983 "imposes liability . . . for conduct that is the effective cause of another's direct infliction of the constitutional injury." *Raub*, 2015 WL 1926416, at *4 n.6 (quoting *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998)). It reasoned that, "because Raub's seizure and detention were based, at least in part, on Campbell's recommendation," Campbell was potentially liable under § 1983. *Id.*

concluded should be subject to a temporary detention order and noting that the evaluator's petition "was comparable to a police officer's affidavit in support of a search warrant"). As the Fourth Circuit has explained, "[w]e encourage law enforcement officers to seek warrants because magistrates from their detached perspective serve as the essential "checkpoint between the Government and the citizen." *Torchinsky*, 942 F.2d at 262 (internal quotations omitted). Accordingly, "[w]hen a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn receive some protection from suit under 42 U.S.C. § 1983." *Id.*

Applying those same principles in the context here, the magistrate's issuance of the TDO on substantially the same facts relied upon by Rhodes means that she is entitled to a presumption that probable cause existed for Goines's detention. *See id.* Moreover, plaintiff has not done what is necessary to rebut the presumption of probable cause here. Specifically, in a case where a plaintiff argues that a warrant (or, as here, a TDO) was issued on less than probable cause, he must make a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *see also Miller v. Prince Georges Cnty.*, 475 F.3d 621, 627–28 (4th Cir. 2007) (in case where there was a mistake in identity of the person arrested, the officer who swore out affidavit was entitled to qualified immunity so long as he did not make the material misstatements in the warrant with actual knowledge of their falsity or with recklessness as to their falsity); *see also Golino v. City of New Haven*, 950 F.2d 864, 870–71 (2d Cir. 1991) (noting that generally an arrest warrant issued by a neutral magistrate creates a presumption that it was objectively reasonable for the officers to believe probable cause existed, but plaintiff can

33

overcome the presumption by showing material false statements were recklessly made in order to obtain the warrant).

Although Goines has denied making some of the threats alleged in the Screening Report, he has not alleged that Rhodes lied or misrepresented what she knew in her report. Indeed, Goines has not alleged that Rhodes either knowingly and intentionally, or with reckless disregard of the truth, made a false statement in her report. *Cf. Miller*, 475 F.3d at 627. In fact, counsel conceded that Rhodes was not "making things up." Thus, Goines has not alleged anything to rebut the presumption of probable cause that arose when the magistrate issued the TDO based on Rhodes's petition.

Probable cause is also evident from the facts contained in the Screening Report itself. Because Goines denies making the threats included in the Screening Report, the court will not credit any threats Rhodes reported hearing directly from Goines. Nonetheless, there remains sufficient additional information, including Rhodes's observations of Goines, as well as other information available to her and upon which she could reasonably rely, that establish probable cause for her to believe both that Goines suffered from a mental illness and that he posed a danger to others.

Rhodes observed that Goines appeared to be reacting to visual stimuli not visible to her, that he displayed an inappropriate affect (including laughing at inappropriate times), and that he was disoriented to time. She noted that he was perseverating on the topic of his neighbors controlling his television. Especially when coupled with the officers' reports to her that he insisted there were clicking noises in his apartment that they did not hear, these facts support a finding of probable cause.

Rhodes also had significantly more information than the officers had at the time of the initial seizure with regard to his being a danger to others. For example, she knew that he owned a firearm, a fact Goines does not dispute. Additionally, while the court does not rely on the threats allegedly conveyed directly to her by Goines (since he denies them), she had information from the officers that Goines had told Dean that he had made threats he was going to assault his neighbors with his hands. (Dkt. No. 1 at Ex. A, at 2.) Although Goines alleges he did not make these statements to the officers, at least in the way described in the Screening Report, the court can, consistent with *Jones*, "treat the exhibit as an allegation that the officers made the statements in the [Screening Report] and . . . treat that allegation as true." 521 F.3d at 561. Nowhere in his complaint or briefing does Goines allege that the officers did not tell Rhodes what she reports they told her.

Furthermore, Rhodes was entitled to rely on that information from those officers. *See, e.g., Cloaninger*, 555 F.3d at 334 (probable cause exists when "the fact and circumstances within [the defendant's] knowledge *and of which [she] had reasonably trustworthy information* were sufficient to warrant a prudent" person to believe the person poses a danger to himself or others) (emphasis added); *United States v. Ramos-Cruz*, 667 F.3d 487, 502 (4th Cir. 2012) ("[o]bservations of fellow officers . . . engaged in a common investigation are plainly a reliable basis for a warrant" (citation omitted)). Thus, Rhodes could rely on the information conveyed to her by the officers, even if, as Goines alleges, he did not make the threats they reported. She had no reason to distrust the officers, and certainly Goines has not pleaded that she should not trust the information they provided; rather, the information they provided was "reasonably trustworthy." *See Cloaninger*, 555 F.3d at 334. Given all these facts, which are even more detailed than the facts the officers had at the time they seized Goines, the court concludes that

35

Rhodes's assessment of Goines and petition for the TDO, were supported by probable cause.[15] Even if probable cause were found to be lacking under these circumstances, Rhodes would be entitled to qualified immunity under the same analysis that entitled the officers to qualified immunity.

Goines also accuses Rhodes (albeit not as a separate cause of action) of engaging in the unauthorized practice of clinical psychology under Virginia's mental-health laws, because Rhodes placed a diagnostic code on the Screening Report. This argument ignores the scheme governing such mental-health evaluations in Virginia. That is, by statute, Virginia permits a person with Rhodes's qualifications and training, acting as a designee for a community mental health services board, to conduct the preliminary mental evaluation. She is a certified prescreener under the statute, and Goines does not contend otherwise. Va. Code Ann. § 37.2-809(A) (an employee who conducts the evaluation prior to a TDO must be "skilled in the assessment and treatment of mental illness and [have] completed a certification program approved by the Department [of Behavioral Health and Developmental Services]").

As part of that evaluation, the screener is required by statute to make a determination as to whether there is probable cause to believe a person is suffering from a mental illness. Thus, despite Goines's objections to Rhodes's making a specific diagnosis, she was required to determine whether she believed the evidence before her showed he suffered from a mental illness. The court does not find Goines's arguments to the contrary persuasive and does not address them further.

---

[15] The court also agrees with the statement of the district court in *Raub* that the determination of probable cause is perhaps even less susceptible of precise definition in the mental-health context, because it "focuses on the more nebulous issues of mental illness and potentiality of violence, rather than an assessment of clearly articulated facts and circumstances." 3 F. Supp. 3d at 535.

Finally, as he did with the officer defendants, Goines repeatedly urges that Rhodes could and should have done more to understand his medical history or his allegations. But, as noted above, "the failure to pursue potentially exculpatory leads will not negate probable cause." *Anderson*, 524 F. App'x. at 861 (citing *Wadkins*, 214 F.3d at 541).

It is unclear whether Goines's false imprisonment claim is also asserted against Rhodes. (*Cf.* Dkt. No. 1, ¶ 70 (Goines's complaint asserting his false imprisonment claim against "one or more Defendants—including, but not limited to Shaw, Dean, and Williams.").) To the extent Goines has asserted such a claim, the court's conclusion that Rhodes's report and evaluation was supported by probable cause also requires dismissal of any claim of false imprisonment against her. *See Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011) (where a "plaintiff's [seizure] was lawful, the plaintiff cannot prevail on a claim of false imprisonment."

For all of these reasons, the claims against Rhodes will be dismissed.

### E. Motion of VCSB

Goines's complaint is not entirely clear as to the basis for his claims against VCSB. It appears that he is arguing both that VCSB should be held liable because it allowed Rhodes to perform evaluations without adequate qualifications, and because it failed to train or supervise her. VCSB argues that Goines has failed to state a *Monell* claim against VCSB.[16] *Monell* held that an entity is liable under § 1983 "only for its *own* illegal acts" and not under a theory of respondeat superior. *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (citing *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). To succeed on such a claim, a plaintiff must show that the defendant maintained a custom, policy, or practice by which local officials violated a plaintiff's constitutional rights. *Id.* Also, Goines cannot prevail on a

---

[16] VCSB initially argued that the claims against it should be dismissed because it lacked the capacity to be sued, but has since withdrawn that argument. (*See* Dkt. No. 43 at 1 n.1.)

failure to train theory merely by alleging the training program is inadequate.  *Canton v. Harris*, 489 U.S. 378, 390 (1989).  Here, then, Goines must allege both that Rhodes violated his constitutional rights and that VCSB caused that deprivation "through an official policy or custom."  Because the court has concluded that Rhodes did not violate Goines's constitutional rights, his claims against VCSB likewise fail and will be dismissed.

## III.    Conclusion

Assuming the truth of all of Goines's allegations, this case presents an unfortunate scenario of significant miscommunications between Goines and the officers who initially assisted him with his complaint that led to additional misunderstandings by Rhodes and finally resulted in his involuntary detention.  The court does not know, and is not tasked with determining, whether those misunderstandings were the result of Goines's inability to communicate clearly, or—as his counsel alleged at oral argument—an unwillingness  by the individual defendants to spend more time trying to understand Goines or to credit his version of events as true.  Regardless, based on the legal standards that it must apply in evaluating Goines's claims, the court concludes that the complaint in this action does not provide Goines with legal recourse.

For the reasons set forth in this opinion, the court will grant the motions to dismiss by all defendants, and will dismiss Goines's complaint in its entirety.  The court will dismiss all claims against the named defendants with prejudice, except that it will dismiss without prejudice the state-law false imprisonment claim against defendants Dean, Shaw, and Williams, over which the court declines to exercise supplemental jurisdiction, and the claim for injunctive relief against

the same three defendants. The court will also dismiss the claims against the John Doe defendants without prejudice.

Entered: May 4, 2015.

*Elizabeth K. Dillon*
United States District Judge